IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| **MARY JANE SAUCEDA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL NO. B-11-259** |
| | § | |
| **UNIVERSITY OF TEXAS AT** | § | |
| **BROWNSVILLE,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER

BE IT REMEMBERED, that on July 26, 2013, the Court considered Defendant's Motion for Summary Judgment and Brief in Support, Dkt. No. 32; the response and reply Dkt. Nos. 59, 61; Defendant's motion to dismiss on jurisdictional grounds not raised in the motion for summary judgment, Dkt. No. 62; the filings related to that motion, Dkt. Nos. 60, 62–63, 64–65; [1] and the record in this case. The Court, predicting Texas law, dismisses Plaintiff's claim of national-origin discrimination under the Texas Commission on Human Rights Act, TEX. LAB. CODE ANN. § 21.051, as time-barred. The Court denies summary judgment on Plaintiff's claim under the Equal Pay Act of 1963, 29 U.S.C. § 206(d), finding that genuine fact issues exist on Defendant's affirmative defense that the salary differential between the female plaintiff and male professors in Defendant's School of Business is based on cognizable factors other than sex. *See* 29 U.S.C. § 206(d)(1).

---

[1] Defendant first raised this issue in its response to Plaintiff's Motion for Leave to File First Amended Complaint. Dkt. No. 37. This Court authorized the parties to file memoranda of law directed to this issue on February 14, 2013. *See* Dkt. No. 57 at 3. Defendant moved to dismiss for lack of subject-matter jurisdiction in its response. *See* Dkt. No. 62 at 1.

I. Background[2]

Plaintiff Mary Jane Sauceda ("Sauceda") has been an associate professor at The University of Texas at Brownsville's ("UTB") School of Business since 1994 and has taught accounting courses continuously since 2001.[3]  *See* Decl. of Mary Jane Sauceda ¶¶ 8–9, Dkt. No. 58 Ex. A.   In this lawsuit, she alleges that UTB has subjected her to unlawful pay discrimination based on her sex and national origin.  *See* Pl.'s First Am. Compl. 6–7, Dkt. No. 58.   Sauceda filed a charge of national origin discrimination with the Texas Workforce Commission–Civil Rights Division ("TWC") on March 19, 2010, Dkt. No. 32 Ex. L; Dkt. No. 59 Ex. A-9.  After receiving a right-to-sue letter,[4] She brings her claim of national origin discrimination under the Texas Commission on Human Rights Act, Tex. Lab. Code Ann. § 21.051, ("TCHRA")[5] and her sex-discrimination claim under the federal Equal Pay Act of 1963, 29 U.S.C. § 206(d), (the "Equal Pay Act").  *See* Pl.'s First Am. Compl. 7.  UTB moves for summary judgment.  Dkt. No. 32.  It argues primarily that Plaintiff failed to exhaust her administrative remedies before filing her TCHRA claim and that Sauceda cannot carry her burden to show that a genuine dispute exists over whether UTB's proffered non-discriminatory reasons for the alleged pay disparities are pretextual.

---

[2] Except where stated otherwise, the Court relies on undisputed facts in the record to set forth the background of this case.  *See* Fed. R. Civ. P. 56(c)(1); *see also*, e.g. *LeBlanc v. Greater Baton Rouge Port Com'n*, 676 F. Supp. 2d 460, 466 n.2 (M.D. La. 2009) ("The summary of background information is composed of undisputed facts taken in large part from the common exhibits that each side submitted. It does not contain all the relevant facts that are a part of the summary judgment record.").

[3] Sauceda avers that she took a leave of absence between 1995 and 1999 to pursue a Ph.D. in accounting. Dkt. No. 58 Ex. A ¶ 9.

[4] The TWC issued a right-to-sue letter on May 25, 2011.  Dkt. No. 33 Ex. 1 to First Am. Compl. at 2.  Sauceda avers, and UTB does not dispute, that Sauceda received the TWC's letter on June 6, 2011.  *See* First Am. Compl. 2, Dkt. No. 58.  This letter concerns only Sauceda's discrimination based on national origin.  *See* Dkt. No. 33 Ex. 2 to First Am. Compl. at 1 (only box for "national origin" discrimination checked.).  "In contrast to causes of action brought under Title VII and the ADEA, Equal Pay Act claims do not require exhaustion of administrative remedies."  *Stith v. Perot Sys. Corp.*, 122 F. Appx. 115, 119 (5th Cir. 2005) (unpublished) (citing *Cnty. of Washington v. Gunther*, 452 U.S. 161, 175 n. 14 (1981)).

[5] The Texas Commission on Human Rights has been replaced by the Texas Workforce Commission's Civil Rights Division, *see* Tex. Lab. Code § 21.0015.  The Court follows the example of Texas courts and refers to Chapter 21 of the Texas Labor Code as the TCHRA.  *E.g., Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 798 n.1 (Tex. 2010).

Sauceda attaches an affidavit to her response to UTB's motion for summary judgment in which she declares: "I am Hispanic.  I am a female."  Dkt. No. 59 Ex. A at 1.  In her First Amended Complaint, she compares her salary to that of other professors she describes as "Anglo/Caucasian" women and men.  Dkt. No. 58 at 3, 4, 5, 6.  UTB disputes none of these factual propositions.  That is, the parties do not dispute that Sauceda's national origin differs from that of her proposed comparators for TCHRA purposes, and they further agree on Sauceda's sex and that of her comparators.

### A. Salaries of Sauceda and Proposed Comparators

UTB apparently set the salaries of all of the faculty members teaching in its School of Business each academic year by issuing one-year memoranda of appointment.  *See* Summary of Starting Salaries of UTB AQ Faculty, Dkt. No. 32 app. A; Sauceda Decl. ¶ 20 (setting forth annual salaries by academic year); Mem. Appointing Faculty for Each Academic Year, Dkt. No. 32 Ex. C-10 to C-12; Dkt. No. 59 Ex. B, C-5, C-6.  In the 2007–08 academic year, Sauceda earned $79,620 annually.  Summary of Starting Salaries, Dkt. No. 32 app. A.  UTB paid her $82,009 in the 2008–09 academic year and $82,830 in the 2009–10 academic year.  *Id.*  She received $90,212 in the 2010–11 academic year and $90,212 the following academic year.  *Id*.

In her First Amended Complaint, Sauceda compares her salary to that of five present and former School of Business faculty members.  UTB categorizes its School of Business faculty members as either academically or professionally qualified under accreditation standards promulgated by the Association to Advance Collegiate Schools of Business (AACSB).  Dkt. No. 32 Ex. H ¶¶ 6-7.  The first two comparators—Carol Collinsworth ("Collinsworth") and Lauran Schmid ("Schmid")— do not hold terminal degrees.  *See* Dkt. No. 59 Ex. G at 22:20-21 (Deposition of Collinsworth); *id.* Ex. H at 9:4-21 (Deposition of Schmid).  UTB considers them professionally qualified.  Dkt. No. 32 Ex. H ¶ 7.  The other three faculty members— Paul G. Robertson ("Robertson"), David Boyd ("D. Boyd") and Sanithia Boyd ("S.

Boyd")—earned doctoral degrees, and UTB considers them academically qualified. *Id.* ¶ 6.

The following table summarizes the annual salaries of faculty categorized as academically qualified from the 1992–93 academic year through the 2012–13 academic year.  Dkt. No. 32 Ex. 1.[6]  Additionally, the table sets forth Collinsworth and Schmid's salaries between the 2008–09 and 2011–12 academic years. *See* Dkt. No. 32 Ex. C-11 & C-12.

| | Sauceda | Ortiz | Barker | Cagwin | Said | Pence | Elshafie | Yin | Robertson | D. Boyd | S. Boyd | Collinsworth | Schmid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1992-93 | $32,217 | | | | | | | | | | | | |
| 1993-94 | $33,184 | | | | | | | | | | | | |
| 1994-95 | $35,175 | | | | | | | | | | | | |
| 1995-96 | $36,238 | | | | | | | | | | | | |
| 1996-97 | leave | | | | | | | | | | | | |
| 1997-98 | leave | | | | | | | | | | | | |
| 1998-99 | leave | $50,000 | | | | | | | | | | | |
| 1999-00 | $46,000 | $65,000 | $71,000 | $71,000 | | | | | | | | | |
| 2000-01 | $50,000 | $65,650 | $71,710 | $71,710 | | | | | | | | | |
| 2001-02 | $55,556 | $66,963 | $76,801 | $76,801 | | | | | | | | | |
| 2002-03 | $66,963 | $66,963 | | | | | | | | | | | |
| 2003-04 | $66,903 | $66,232 | | | $78,000 | | | | | | | | |
| 2004-05 | $72,163 | $71,481 | | | $79,190 | | | | | | | | |
| 2005-06 | $74,328 | $80,773 | | | | $85,000 | $85,000 | | | | | | |
| 2006-07 | $77,301 | $84,004 | | | | | $88,400 | | | | | | |
| 2007-08 | $79,620 | $86,524 | | | | | | $88,000 | | | | | |
| 2008-09 | $82,009 | $89,120 | | | | | | | | | | $80,708 | $82,814 |
| 2009-10 | $82,830 | $90,012 | | | | | | | $105,000 | | | $81,516 | $83,643 |
| 2010-11 | $90,212 | $90,212 | | | | | | | $105,200 | $97,000 | $90,000 | $87,146 | $83,843 |
| 2011-12 | $90,212 | $90,212 | | | | | | | $105,200 | $97,000 | $90,000 | $87,146 | $88,035 |
| 2012-13 | $90,212 | | | | | | | | | $107,000 | $100,000 | | |

## B. Procedural History

Sauceda originally filed this case in Texas district court. *See* Dkt. No. 1 Ex. 5.  UTB removed it to this Court pursuant to 28 U.S.C. §§ 1441(a) and 1331 because Sauceda's Equal Pay Act claim arises under federal law. *See* Notice of Removal 1, Dkt. No. 1.  Discovery concluded on October 1, 2012.  Dkt. No. 23 at 1.

UTB has moved for summary judgment, Dkt. No. 32, and the Court also has before it jurisdictional memoranda and a motion to dismiss addressing the question whether Sauceda has exhausted her administrative remedies regarding Robertson as to her TCHRA claim.  UTB argues that Sauceda's TCHRA claim is time-barred.

---

[6] The table attached to UTB's motion for summary judgment from which this table draws does not include an affidavit establishing that it is admissible as a business record or would otherwise be exempted from the rule against hearsay. *See* FED. R. EVID. 803(6).  Sauceda does not object that the assertions of fact found in this exhibit "cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

UTB also seeks summary judgment dismissing Sauceda's Equal Pay Act claim. As discussed more fully in Part III, UTB alleges that it paid Robertson and the Boyds a higher salary to attract them and thereby bolster UTB's efforts to obtain AACSB accreditation for its School of Business. *See* Dkt. No. 32 Ex. H ¶18; *Id.* Ex. G at 43:9-12. AACSB accreditation guidelines require at least 50% of a business school's faculty to be academically qualified. Dkt. No. 32 Ex. H ¶ 9. Based on its conclusion that Sauceda had not produced sufficient qualifying academic publications or other intellectual contributions, UTB did not consider Sauceda academically qualified when it hired Robertson and the Boyds. *See id* ¶¶ 8-9. UTB asserts that it set what it believed to be the most competitive salary it could to attract academically qualified faculty like Robertson and the Boyds from other institutions. *See id.* Ex. G at 29:12-24. It contends that due to a phenomenon known as salary compression, new hires from outside an institution can often command a greater salary than existing faculty members, and the salary disparities between Sauceda on the one hand and Robertson and D. Boyd on the other resulted from this legitimate, non-discriminatory phenomenon. Dkt. No. 32 at 33.

## II. TIMELINESS OF TCHRA CLAIM

UTB's motions raise two jurisdictional challenges to Sauceda's national origin discrimination claim under the TCHRA. Both rely on the theory that Sauceda failed to exhaust her administrative remedies before filing suit. First, UTB argues that Sauceda's national origin discrimination claim is time-barred because no cognizable act of intentional discrimination occurred within 180 days of March 19, 2010, the date on which she filed her charge of discrimination with the Texas Workforce Commission. *See* TEX. LAB. CODE § 21.202(a) (West 2013). Second, UTB asserts in its pending motion to dismiss that Sauceda cannot compare her salary to that of Paul G. Robertson because his name does not appear on that charge. The Court finds the first question dispositive and consequently does not reach the second.

### A. Legal Standard

"The [T]CHRA . . . establishes a 'comprehensive administrative review system,' under which the 'exhaustion of administrative remedies is a mandatory prerequisite to filing a civil action alleging violations of the [T]CHRA.'" *Hoffmann–La Roche, Inc., v. Zeltwanger*, 144 S.W.3d 438, 446 (Tex. 2004) (quoting *Schroeder v. Tex. Iron Works, Inc.*, 813 S.W.2d 483, 485, 488 (Tex. 1991)); *see also City of Waco v. Lopez*, 259 S.W.3d 147, 149, 154 (Tex. 2008).   As more fully discussed below, TCHRA claims must generally be filed within a 180-day limitations period.   *See* TEX. LAB. CODE § 21.202(a) (West 2013).   This 180-day limitations period has been construed as "'mandatory and jurisdictional' under Texas law." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281 (5th Cir. 2004) (quoting *Specialty Retailers, Inc. v. DeMoranville*, 933 S.W.2d 490, 492 (Tex. 1996) (per curiam)); *accord. Collins-Pearcy v. Mediterranean Shipping Co. (USA), Inc.*, 698 F. Supp. 2d 730, 742 (S.D. Tex. 2010) (quoting *Univ. of Tex. v. Poindexter*, 306 S.W.3d 798, 807 (Tex. App.-Austin 2009)); *see also Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 513–14 (Tex. 2012) (explaining that Texas legislature affected limited waiver of sovereign immunity in TCHRA and holding that professor's "failure to comply with the requirements of Section 21.202 is a jurisdictional bar to her suit against the University").

The parties do not dispute the facts relevant to the timeliness inquiry under § 21.202(a), only their legal significance.   The Court therefore resolves the jurisdictional questions raised by UTB in its motion for summary judgment based on the undisputed facts just as a Texas court would.   *See Univ. of Tex. v. Poindexter*, 306 S.W.3d 798, 806 (Tex. App.-Austin 2009) (citing *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004)) ("If, however, the facts relevant to jurisdiction are undisputed, the court should make the jurisdictional determination as a matter of law based solely on those undisputed facts.").

### B. Undisputed Facts

Sauceda filed her intake questionnaire with the TWC on March 19, 2010. Dkt. No. 32 Ex. L; Dkt. No. 59 Ex. A-9.   She checked the box for a national origin

claim and wrote "Hispanic" in the blank provided to identify her national origin. *See* Dkt. No. 59 Ex. A-9 at 1. In the blank provided for a list of "employees treated more fairly than you," Sauceda wrote "Carol Collinsworth" and "Lauran Schmid." *Ibid.* at 2.   UTB increased Collinsworth and Schmid's salaries beginning in the 2008–09 academic year.   *See* Memoranda of Appointment from Juliet V. Garcia, President, to Caroline Collinsworth & Lauran Schmid (Sept. 1, 2008), Dkt. No. 32 Ex. C-11 at 1, Ex. C-12 at 1.   UTB hired Robertson to begin teaching in the 2009–10 academic year.   Pl.'s First Am. Compl. 3, Dkt. No. 58.

Sauceda states in her First Amended Complaint that she sent an email message to the Interim Dean of the College of Business stating "that she expected a raise after the recent hiring of an accounting Ph.D. faculty member" on March 23, 2009.   *Id.*   She further alleges that she followed up with a second e-mail to the Interim Dean asking about a raise and stating "that she was earning $25,000 less than the new hire, Dr. Paul Robertson." *Id.* at 4.

Sauceda wrote December 22, 2009—a date facially within the limitations period—in the space labeled "Date of First Harm" on her intake questionnaire.   Dkt. No. 59 Ex. A-9 at 2.   In the blank for "Employment Harms or Actions," Sauceda wrote "Raise denied." *Id.*   She included the following narrative:

> On December 22, 2009, I requested an answer to my requests for a market adjustment (raise) made on March 23, 2009, September 4, 2009, December 10, 2009, and December 22, 2009.   To date, I have not received an answer and/or a raise.   I believe my request was denied.   I have been requesting a raise since March 28, 2007, when I discovered two of my Anglo co-workers (with less qualifications than myself) received a substantial raise in pay earlier in the year.

*Id.*

UTB does not challenge Sauceda's assertion that the December 22, 2009, event to which she refers in the intake questionnaire is a pair of e-mail messages between Sauceda and Alan Artibise ("Artibise ") exchanged on that date.   *See* Dkt. No. 59 Ex. A-8 at 18.   Sauceda sent the first message to Artibise.   *See id.*   She wrote

in that message: "At the beginning of this semester, I asked . . . for a market adjustment because I had two papers accepted for publication." *Id.* She explained that she had been told that Artibise would decide whether to adjust her salary, *see id.*, and "request[ed] a definite answer to my request." *Id.* Sauceda also pointed out that the "salary of two Anglo females with only an MBA degree and a CPA degree was adjusted two years ago." *Id.* Artibise responded that same day. *Id.* He stated that "[t]his is the first time I was made aware of your claim. I will investigate early in the new year and respond." *Id.* The parties agree that Artibise never responded to Sauceda. Pl.'s First Am. Compl. 5, Dkt. No. 58; Dep. Of Alan Artibise 20:11–13, Dkt. No. 59 Ex. J. Sauceda alleges that Artibise "obviously" denied her request by failing to respond. Decl. of Mary Jane Sauceda ¶ 23, Dkt. No. 59 Ex. A.

### C. Discussion

The parties disagree as to whether, under Texas law, Artibise's December 22, 2008, e-mail message and his subsequent failure to respond to Sauceda amount to an occurrence of an alleged unlawful employment practice which commenced the running of the limitations period for filing a claim with the TWC. Section 21.202 of the Texas Labor Code provides as follows:

> (a) A complaint under this subchapter must be filed not later than the 180th day after the date the alleged unlawful employment practice occurred.
> (b) The commission shall dismiss an untimely complaint.

Tex. Lab. Code § 21.202 (West 2013).

Relying on the Texas Supreme Court's recent decision in *Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500 (Tex. 2012), UTB contends that Sauceda had to file her national origin discrimination complaint within 180 days of March 28, 2007, when she "discovered" that Collinsworth and Schmid received pay increases. Dkt. No. 32 Ex. L at 2; Dkt. No. 59 Ex. A-9 at 2.

The *Chatha* court considered whether a professor timely filed a TCHRA charge two years after she received a promotion to full professor without an accompanying salary increase. *See* 381 S.W.3d at 503. The University promoted

the plaintiff from the rank of associate professor to professor in 2004. *Id.* At that time, the plaintiff "complained to the University that her salary was inequitable but was told there were no funds available for a salary adjustment." *Id.* Approximately two years later, she filed a pay-discrimination complaint with the TWC. *Id.*

Chatha argued that her claim was timely because she received a paycheck within 180 days of filing her complaint, and she would have been paid more had she not been allegedly subjected to salary discrimination in 2004. *See id.* at 504. She invited the Texas Supreme Court to adopt the definition of the occurrence of an employment practice enacted by Congress in the Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111–2, 123 Stat. 5. *See id.* at 507. The Ledbetter Fair Pay Act amended the cognate limitations provision of Title VII of the Civil Rights Act of 1964 to provide that "an unlawful employment practice occurs . . . [, inter alia,] . . . when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice." 42 U.S.C.A. § 2000e–5(e)(3)(A) (2013).

The *Chatha* court expressly declined the plaintiff's invitation and held that § 21.202 of the TCHRA does not incorporate the Ledbetter Act's definition of when a discriminatory act occurs. *See* 381 S.W. 3d at 507–09. The Court reasoned the Texas legislature had not passed an analogous amendment to the TCHRA.[7] *See id.* ("For this Court to apply a non-analogous federal statute like the Ledbetter Act in the absence of legislative action would require us to abdicate our role as interpreters of the law in favor of a lawmaking function. We decline to take that role.").

Consequently, the *Chatha* court held that the standard enunciated in its prior cases construing § 21.202(a) as meaning that "the 180–day limitations period in the TCHRA commences 'when the employee is informed of the allegedly

---

[7] In so doing, the *Chatha* court explicitly disagreed with the predictions of two federal district courts that Texas would adopt the Ledbetter Act's definition of when a prohibited employment practice occurs. *Id.* at 509 (citing *Klebe v. Univ. of Tex. Sys.* 649 F. Supp. 2d 568, 571 (W.D. Tex. 2009); *Lohn v. Morgan Stanley DW, Inc.*, 652 F. Supp. 2d 812, 829 (S.D. Tex. 2009).

discriminatory employment decision, not when that decision comes to fruition'" remains the law of Texas notwithstanding Congress's passage of the Ledbetter Fair Pay Act. *Id.* at 505 (quoting *Specialty Retailers*, 933 S.W. 2d at 493). In reaching this conclusion, the *Chatha* court expressly acknowledged that its decision was consistent with that of the United States Supreme Court in *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007), which it described as "recogniz[ing] that a paycheck containing a discriminatory amount is not a present violation, but rather the effect of a prior act of discrimination." *Chatha*, 381 S.W. 3d at 506 (citing *Ledbetter*, 550 U.S. at 628). Reasoning that "[i]n pay discrimination cases, the setting of an alleged discriminatory pay rate is a discrete act—that is, the only act taken with a discriminatory motive is the pay-setting decision." *Id.* at 510. The *Chatha* court held that the plaintiff could not rely on the paychecks she received within the 180-day limitations period. *Id.* ("[s]ubsequent paychecks containing an alleged discriminatory pay amount are merely consequences of past discrimination and do not constitute an unlawful employment practice under the TCHRA.").

Because of the limitations provision in § 21.202(a), then, this Court has jurisdiction only over discrete acts of alleged discrimination which occurred on or after September 20, 2009, 180-days before Sauceda filed her charge with the TWC. *See Chatha*, 381 S.W.3d at 505. Because Sauceda stated in her intake questionnaire that on March 28, 2007, she "discovered" that UTB increased Collinsworth and Schmid's salaries beginning in the 2008–09 academic year, she had 180-days from March 28, 2007, to file a complaint based on that decision. This court lacks jurisdiction to consider her TCHRA national origin claim to the extent it is based on any decision made on or before March 28 2007, to increase Collinsworth and Schmid's salaries. *See Chatha*, 381 S.W. 3d at 510; *Specialty Retailers*, 933 S.W. 2d at 492. Similarly, Sauceda's allegations in her First Amended Complaint demonstrate that she knew of Robertson's hire and his salary by the time she sent an e-mail message alleging that she earned $25,000 less than Robertson did. *See* Dkt. No. 58 at 4. This court therefore lacks jurisdiction over Sauceda's national

origin claim to the extent it is based on pre-September 4, 2009, decision to hire Robertson and set his pay. *See Chatha*, 381 S.W. 3d at 510.

However, the e-mail messages between Sauceda and Artibise which Sauceda alleges amount to a constructive denial of her request for a pay increase, include header fields facially showing that they were sent on December 22, 2009, within 180 days of March 19, 2010, *See* Dkt. No. 32 Ex. A-8 at 18.  UTB argues that, like the issuance of subsequent paychecks in *Chatha*, Artibise's December 22, 2009, e-mail message and subsequent conduct was a mere consequence of the alleged past discriminatory pay-setting decision made in 2007, not a separately-actionable discrete act of alleged discrimination. *See Chatha*, 381 S.W.3d at 510.  A one-time employment event-including the failure to hire, promote, or train is a discrete action that "'constitutes a separate actionable unlawful employment practice,' and therefore, should place an employee on notice that a cause of action has accrued." *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 280 (5th Cir. 2004) (*quoting Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002)).  Such discrete acts are separately actionable even if time-barred claims are not. *Id.* at 281 (*citing Estate of Martineau v. ARCO Chem. Co.*, 203 F.3d 904, 912 (5th Cir. 2000)).  The Texas Supreme Court in *Chatha* implicitly recognized that in some circumstances the denial of a request for a pay increase constitutes an actionable pay-setting decision if it occurs within the limitations period[8] *See* 381 S.W. 3d at 503, 509–10.

The *Chatha* decision does not address the question of whether and in what circumstances the denial of a subsequent request for a pay increase amounts to a "mere continuation" of the original pay-setting decision. *See id.* at 510.

Because the parties do not cite any binding decisions of the Texas Supreme Court, this Court must hazard an *Erie* guess and "attempt to predict state law, not to create or modify it." *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir. 2012)

---

[8] *See also*, e.g., *Tillman v. S. Wood Preserving of Hattiesburg, Inc.*, 377 F. Appx. 346, 349 (citing *Miller v. N.H. Dep't of Corr.*, 296 F.3d 18, 21-22 (1st Cir. 2002)) (holding exclusion of employee from across-the-board raise is discrete act under Title VII); *Moini v. Univ. of Tex. at Austin*, No. A–10–CA–180–SS, 2011 WL 90472, at *10 (W.D. Tex. Jan. 10, 2011) ((citing *Morgan*, 536 U.S. at 114 (concluding that professor's claims of "denial of raises and lack of promotion are discrete acts").

(*quoting Am. Waste & Pollution Control Co. v. Browning–Ferris, Inc.*, 949 F.2d 1384, 1386 (5th Cir. 1991)) (other citation omitted); *See also Gaia Tech. Inc. v. Recycled Prods. Corp.*, 175 F.3d 365, 375 n.11 (5th Cir. 1999) (making *Erie* guess on claims under Texas law where court had supplemental jurisdiction over state-law claims). In making an *Erie* guess, this Court "defer[s] to intermediate state appellate court decisions, unless convinced by other persuasive data that the higher court of the state would decide otherwise." *Cerda v. 2004–EQR1 L.L.C.*, 612 F.3d 781, 794 (5th Cir. 2010).

The Texas Supreme Court ruled that the issuance of a paycheck is not separately actionable in *Chatha* because "the discriminatory employment decision is the practice made with discriminatory intent." 381 S.W.3d at 509. According to the *Chatha* court, no discriminatory intent separate from the original pay-setting decision can be attributed to the decision to issue a paycheck. *See id.* at 509–10.

In *Ledbetter*, on which the *Chatha* Court relied, *see id.* at 506, the United States Supreme Court held that the denial of a request for a raise was not separately actionable as an intentional act of employment discrimination where the employee argued only that the timely raise denial "'carried forward' the effects of prior, uncharged discrimination decisions." 550 U.S. at 624–25 (quoting petitioner's brief). The *Chatha* Court likewise grounded its holding on the TCHRA's requirement of discriminatory intent accompanied by a discrete act within the limitations period. *Compare Ledbetter*, 550 U.S. at 629 *with Chatha*, 381 S.W.3d at 509–10. Intermediate Texas courts have similarly distinguished between denials of a requested pay increase which carry forward a prior allegedly discriminatory decision and those which are separately discriminatory. *Compare, e.g., Cooper-Day v. RME Petroleum Co.*, 121 S.W. 3d 78, 85 (Tex. App.-Fort Worth 2003) (holding pay-discrimination claims accrued each time plaintiff received allegedly insufficient raise where each decision set different pay for plaintiff); *Donna Indep. Sch. Dist. v. Rodriguez*, No. 13-09-00185-CV, 2009 WL 2962376, at *1, *3 (Tex. App.-Corpus Christi Sept. 17, 2009) (holding subsequent decision to increase employee's pay separately actionable even though made by board of supervisors on internal appeal

of prior decision where second decision set different salary for employee and did not carry forward prior different pay-setting decision) *with Lamar Univ. v. Jordan*, No. 09-10-00292-CV, 2011 WL 550089, at *3 (Tex. App.-Beaumont Feb. 17, 2011) (holding period for professor to file discrimination complaint based on department's decision to deny tenure application commenced when department's decision communicated to professor where professor conceded that no discriminatory intent accompanied subsequent decision affirming prior decision by higher-level university officials).  Consequently, the Court predicts that the Texas Supreme Court would adopt the reasoning of *Ledbetter* and require a plaintiff at a minimum to allege that a timely denial of a requested raise was accompanied by discriminatory intent rather than an intent to carry forward a time-barred pay-setting decision.  *See Ledbetter*, 550 U.S. at 624–25, 629–30; *Jordan*, 2011 WL 550089, at *3.

The Court therefore turns to Sauceda's First Amended Complaint and the undisputed evidence to determine whether she alleges discriminatory intent.  In her First Amended Complaint and response to UTB's motion for summary judgment, Sauceda sets forth the substance of her e-mail message to Artibise requesting a raise on December 22, 2009, and Artibise's response that same day.  *See* Dkt. No. 58 at 4–5; Dkt. No. 59 at 8–9.  She then asserts that Artibise did not send a response.[9] Dkt. No. 58 at 5; Dkt. No. 59 at 9; *see also* Artibise Dep. 20:11–13, Dkt. No. 59 Ex. J;[10] Sauceda Decl. ¶ 23, Dkt. No. 59 Ex. A.  Finally, Sauceda concludes in her response to UTB's motion for summary judgment that "[t]he employment action of the raise denial occurred within 180 days of the filing of the Charge of Discrimination and there is jurisdiction."  Dkt. No. 59 at 9.  Nowhere in the First Amended Complaint; response, Dkt. No. 59; or declaration does Sauceda allege or argue that Artibise's putative denial of her request for a pay increase was accompanied by discriminatory intent; instead, she avers only that a she made a request and that Artibise denied it *sub silencio*.  *See* Sauceda Decl. ¶ 23 (avering

---

[9] Sauceda implicitly asks the Court to draw the inference that Artibise sent no response to her.

[10] Sauceda cites this deposition as Exhibit G in her response to UTB motion for summary judgment.  Dkt. No. 59 at 9.

that request for pay increase was "obviously denied" because Artibise did not respond).

In sum, then, Sauceda alleges only that she sent an e-mail message requesting a pay increase to Artibise, Artibise stated that he would "investigate it", and Sauceda heard nothing further from Artibise. This evidence is consistent with an intent to carry forward the prior pay-setting decision, and the Court predicts that Texas courts would decline to infer discriminatory intent in the absence of further allegations or evidence from the plaintiff. *See Ledbetter*, 550 U.S. at 624–25; *Chatha*, 381 S.W.3d at 509–10; *Jordan*, 2011 WL 550089, at *3. Consequently, Court dismisses Sauceda's TCHRA claim as time-barred under § 21.202(a).

### III. EQUAL PAY ACT CLAIM

"In short, [the Equal Pay Act] demands that equal wages reward equal work." *Siler–Khodr v. Univ. of Tex. Health Sci. Ctr. San Antonio,* 261 F.3d 542, 546 (5th Cir. 2001) (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)). The text of the Equal Pay Act provides:

> (1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided*, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

29 U.S.C.A. § 206(d)(1) (2013).

UTB moves for summary judgment dismissing Sauceda's claim under the Equal Pay Act because, it argues, the pay differential between Sauceda and two male professors teaching in UTB School of Business resulted from factors other than sex.[11]

"Unlike Title VII, the burden of persuasion may shift from the plaintiff to the defendant in a suit under the Equal Pay Act." *Jones v. Flagship Int'l.*, 793 F.2d 714 (5th Cir. 1986). The plaintiff bears the initial burden of making out a prima facie case of discrimination under the Equal Pay Act by "showing that an employer compensates employees differently for equal work." *King v. Univ. Healthcare Sys., L.C.*, 645 F.3d 713, 723 (5th Cir. 2011) (citing *Siler–Khodr*, 261 F.3d at 546). To make out a prima facie case under the Equal Pay Act, a plaintiff must show that "1. her employer is subject to the Act; 2. she performed work in a position requiring equal skill, effort, and responsibility under similar working conditions; and 3. she was paid less than the employee of the opposite sex providing the basis of comparison." *Chance v. Rice Univ.*, 984 F.2d 151, 153 (5th Cir. 1993). If the plaintiff makes out a prima facie case, the burden of proof "shifts to the employer to show that the differential is justified under one of the Act's four exceptions." The four enumerated exceptions to the Equal Pay Act "are affirmative defenses on which the employer has the burden both of production and of persuasion." *Jones,* 714 F.2d at 722 (quoting *Corning Glass Works*, 417 U.S. at 497).

### A. Summary Judgment Standard

A motion for Summary judgment must be granted when the movant establishes that the pleadings, affidavits, and other evidence available to the Court demonstrate that no genuine issue of material fact exists, and the movant is thus entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Piazza's Seafood World, LLC v. Odom*, 448 F.3d 744, 752 (5th Cir. 2006); *Lockett v. Wal-Mart Stores, Inc.*, 337 F. Supp. 2d 887, 891 (E.D. Tex. 2004). "A genuine issue of material fact

---

[11] The Eleventh Amendment does not bar Sauceda's Equal Pay Act claim "because Congress has expressly abrogated sovereign immunity under the Equal Pay Act." *Raj v. La. State Univ.*, 714 F.3d 322, 330 n.4 (5th Cir. 2013) (citing *Siler–Khodr* 261 F.3d at 550).

exists when the evidence is such that a reasonable jury could return a verdict for the non-movant." *Piazza's Seafood World, LLC*, 448 F.3d at 752 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court must view all evidence in the light most favorable to the non-moving party. *Piazza's Seafood World, LLC*, 448 F.3d at 752; *Lockett*, 337 F. Supp. 2d at 891. Factual controversies must be resolved in favor of the non-movant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." *Little v. Liquid Air Corp.*, 36 F.3d 1069, 1075 (5th Cir. 1994). Thus, the Court will not, "in the absence of proof, assume that the nonmoving party could or would prove the necessary facts." *Id.* (emphasis removed) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)); *see also TIG Ins. Co. v. Eagle, Inc.*, Civ. Action No. 05-0179, 2007 WL 861153, at *2 (E.D. La. 2007) (quoting *Little*, 36 F.3d at 1075).

The non-movant has no duty to respond to a motion for summary judgment until the moving party carries its initial burden of showing that no genuine issue of fact exists. *See Lockett*, 337 F. Supp. 2d at 891 (citing *Ashe v. Corley*, 992 F.2d 540, 543 (5th Cir. 1993)). However, if the movant carries its burden, the non-movant must then come forward with specific evidence to show that there is a genuine issue of fact. *Lockett*, 337 F. Supp. 2d at 891; *see also Ashe*, 992 F.2d at 543. The non-movant may not merely rely on conclusory allegations or the pleadings. *Lockett*, 337 F. Supp. 2d at 891. Rather, it must cite specific facts identifying a genuine issue to be tried in order to avoid summary judgment. *See* FED. R. CIV. P. 56(e); *Piazza's Seafood World, LLC*, 448 F.3d at 752; *Lockett*, 337 F. Supp. 2d at 891. "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915–16 & n.7 (5th Cir. 1992)). Thus, once it is shown that a genuine issue of material fact does not exist, "[s]ummary judgment is appropriate . . . if the non-movant 'fails to make a showing sufficient to establish the existence of an element essential to that party's case.'" *Arbaugh v. Y&H Corp.*, 380

F.3d 219, 222–23 (5th Cir. 2004) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

By its very nature, an affirmative defense generally "places the burden of proof on the party pleading it." *Frame v. City of Arlington*, 657 F.3d 215, 239 (5th Cir. 2011) (en banc) (footnote, quotation, and citations omitted); *see also* Fed. R. Civ. P. 8(c). To succeed on a motion for summary judgment "[w]here the movant bears the burden of proof on an affirmative defense . . . , the movant 'must establish beyond peradventure all of the essential elements of the defense to warrant judgment in his favor.'" *Addicks Servs., Inc. v. GGP-Bridgeland, LP*, 596 F.3d 286, 293 (5th Cir. 2010) (internal quotation marks omitted) (quoting *Chaplin v. NationsCredit Corp.*, 307 F.3d 368, 372 (5th Cir. 2002) (ellipsis omitted).

### B. Plaintiff's Prima Facie Case

In a footnote to its motion for summary judgment, UTB states that it "does not concede that Plaintiff can establish a *prima facie* case and holds Plaintiff to her burden." Def.'s M. for Summ. J. 23 n.7, Dkt. No. 32. Sauceda responds with arguments and summary-judgment evidence which she asserts satisfies her obligation to go beyond the pleadings and make out a prima facie case of an Equal Pay Act violation. *See* Dkt. No. 59 at 12–14. UTB does not argue in its reply, Dkt. No. 61, that Sauceda's summary-judgment evidence is insufficient in this regard. The Court therefore briefly summarizes in part Sauceda's summary-judgment evidence of her prima facie case to contextualize UTB's affirmative defense. *See Yelton v. PHI, Inc.*, Civ. A. No. 09-3144, 2010 WL 9097178, at *3 (E.D. La. Dec. 13, 2010) (denying summary judgment on theory movant asserted in motion for summary judgment because movant abandoned argument in his reply).

Sauceda states in her declaration that UTB paid Robertson and D. Boyd more than it paid her for performing substantially similar work. *See* Dkt. No. 59 Ex. A ¶¶ 21, 25. Her summary-judgment evidence confirms the existence of a pay differential beginning when UTB hired Robertson and D. Boyd continuing through the 2011–12 academic year when Robertson left UTB and the 2012–13 academic

year when D. Boyd left UTB.[12]  *See*, supra, Part I.A and sources cited therein; Dkt. No. 59 Ex. B at 1–4; *id.* Ex. C-6 at 1.  In brief, UTB paid Sauceda nearly $83,000 annually in the 2009–10 academic year and approximately $90,000 annually each following academic year.  *See* Sauceda Decl. ¶ 20.  Robertson earned $105,000 per year during his employment at UTB, and D. Boyd drew a salary of approximately $97,000 annually until the 2012–13 academic year when he UTB paid him an annual salary of $107,000.  *See ibid.*

To establish that she performed substantially similar work to Robertson and D. Boyd, Sauceda cites the deposition of Paul Otero ("Otero").[13] Dkt. No. 59 Ex. F., Otero testified that he served as the interim Dean of UTB's School of Business from January of 2005 through August of 2006 and from August of 2009 through December 31, 2010—the latter period encompassing the 2009-10 academic year in which Robertson was hired.[14]  See *id.* At 12:1–24.  When viewed in the light most favorable to Sauceda, Otero's deposition tends to show that Sauceda performed work as an accounting professor requiring equal skill, effort, and responsibility under similar working conditions to Robertson and D. Boyd.[15]  *See id.* At 111:25–

---

[12] Sauceda cites the affidavit of Ralph Carlson, a statistics professor at The University of Texas-Pan American, who opines on the probability that Sauceda's salary is comparable to that of Robertson and D. Boyd assuming a normal distribution in the salary population reviewed.  *See* Dkt. No. 59 Ex. E at 1-3; *id.* Ex. K (setting forth approximate p-values for z-scores in standard normal distribution).  The Court expresses no view on the weight or sufficiency of this statistical evidence.

[13] All of Sauceda's comparators teach in UTB's College of Business.  UTB does not seek to justify the pay disparity here in light of the external market forces which might in certain circumstances account for the difference between, for example, professors teaching in the humanities or social sciences on the one hand and law or engineering on the other.  *See Wilkins v. Univ. of Houston*, 654 F.2d 388, 402 (5th Cir. 1981) (rejecting in university-wide class action purely statistical evidence of alleged university-wide pay discrimination because evidence failed to address variable of college in which professor taught).  Aside from the different burdens under the Equal Pay Act and the Age Discrimination in Employment Act, the differences in the markets for faculty teaching disciplines also distinguishes *Ross v. University of Tex. at San Antonio*, 139 F.3d 521, 526 (5th Cir. 1998) (holding plaintiff's purely statistical evidence of university-wide wages failed to account for possible differences between professors teaching in different fields).

[14] To be precise, in 2005, Otero states that he served as co-Interim Dean with Mary Sullivan. *Id.* At 12:25–13:1.

[15] Otero mentions expectations set forth in the "HOOP."  E.g., *id.* 112:21–22, 113:4–5.  An explanation of the meaning of this term in context does not become apparent after a cursory search of the portion of Otero's deposition excerpted in the summary judgment record.

112:24 (stating repeatedly that Sauceda and her comparators were expected to meet "similar expectations")

The record also includes evidence that Sauceda holds the rank of associate professor as did Robertson.  *See* Sauceda Decl.¶ 8, Dkt. No. 59 Ex. A; Decl. of Musa Essayyad ¶ 15, Dkt. No. 32 Ex. H.  UTB did not, however, appoint Robertson with tenure; Sauceda, on the other hand, has earned tenure.[16]  *See* Essayyad Decl. ¶ 15; Sauceda Decl. ¶ 8.  Meanwhile, D. Boyd did not want a tenure-track position and so held the title of visiting professor.  Essayyad Decl.  ¶ 16.; *see also Siler-Khodr v. Univ. of Tex. Health Science Ctr. San Antonio*, 261 F.3d 542, 544 (5th Cir. 2001) (comparing two professors who taught courses and conducted research in same department of medical school); *Chance v. Rice Univ.*, 989 F.2d 179, 180 (5th Cir. 1993) comparing professors at same rank in humanities division of large university).

### C. Defendant's Affirmative Defense: Factor Other Than Sex

Relying primarily on the deposition of Hugh M. Shane ("Shane"), Dkt. No. 32 Ex. G, and the affidavit of Essayyad, *id*. Ex. G–H, UTB argues that its summary-judgment evidence establishes beyond peradventure that the salary differential between Sauceda on the one hand and Robertson and D. Boyd on the other is based on cognizable factors other than sex.  Shane served as Dean of UTB's School of Business from the 2006–07 academic year through August of 2009, Shane Dep. At 21:17–18; Essayyad held the title of Associate Dean in that school from August 1, 2007 through July 23, 2012, Essayyad Af. ¶ 2.  In short, UTB asserts that it needed to pay Robertson and D. Boyd greater salaries to attract them to UTB and make their portfolio of scholarly publications and other accreditation-qualifying activities a part of the School of Business's accreditation application with the AACSB.  *See id*. ¶ 12; M. for Summ. J. 28, Dkt. No. 32.  As previously mentioned, supra, UTB further contends that forces of supply and demand for individuals with a Ph.D. in business seeking teaching positions also influenced the higher salaries for

---

[16] According to the then-Dean of UTB's School of Business, Robertson negotiated at the time UTB offered him a position and obtained three years' credit toward tenure.  Dkt. No. 32 Ex. H ¶ 16.

Robertson and D. Boyd in a phenomenon described as salary compression or inversion. *See* M. for Summ. J. at 29–31. Sauceda responds that UTB's alleged factor other than sex boils down to the contention that "the salary paid to a new employee is driven almost entirely by market forces the University must expend resources to attract qualified individuals in a market where other organizations have the same goal," and the Fifth Circuit held that a defendant cannot rely on such evidence alone to obtain summary judgment on a factor-other-than-sex defense in *Siler-Khodr*, 261 F.3d at 549.

In 1969, the Fifth Circuit held that only reasons which are "in harmony with the Congressional purpose [of the Equal Pay Act]: The elimination of those subjective assumptions and traditional stereotyped misconceptions regarding the value of women's work," amount to cognizable factors other than sex which justify a pay differential under that Act. *Schultz v. First Victoria Nat'l Bank*, 420 F.2d 648, 656 (5th Cir. 1969) (footnote omitted); *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 210–11 (1974) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 436 (1971)) (looking to purpose of Equal Pay Act to hold that "company's continued discrimination in base wages between night and day workers, though phrased in terms of a neutral factor other than sex, nevertheless operated to perpetuate the effects of the company's prior illegal practice of paying women less than men for equal work"). As the Supreme Court held in *Corning Glass*, a pay differential which "ar[ises] simply because men would not work at the low rates paid women . . . [and reflect[s] a job market in which [the employer] could pay women less than men for the same work" is not based on a cognizable factor other than sex under the Equal Pay Act. 417 U.S. at 205 n.26. "That the company took advantage of such a situation may be understandable as a matter of economics, but its differential nevertheless became illegal once Congress enacted into law the principle of equal pay for equal work." *Id.* That is, to say that an otherwise unjustified pay differential between women and men performing equal work is based on a factor other than sex because it reflects market forces which value the equal work of one sex over the other perpetuates the market's sex-based subjective assumptions and

stereotyped misconceptions Congress passed the Equal Pay Act to eradicate. *See id.* at 205 n.26, 210–11; *Griggs*, 401 U.S. at 436; *First Victoria Nat'l Bank*, 420 F.2d at 657-58 (discussing market-correcting purposes of Equal Pay Act and concluding that "[t]he Congressional purpose is clear whether divined by traditional doctrines of statutory construction or, more plausibly, the legislative history with respect to the statutory exception"); *Hodgson v. Brookhaven*, 436 F.2d 719, 726 (5th Cir. 1970) ("Clearly the fact that the employer's bargaining power is greater with respect to women than with respect to men is not the kind of factor Congress had in mind. Thus it will not do for the hospital to press the point that it paid orderlies more because it could not get them for less.").

So long as it is consistent with the purposes of the Equal Pay Act[17], then, an employer may base a salary differential on a factor other than sex, including: (1) "different job levels;" (2) "different skill levels;" (3) "previous training;" (4) "experience;" and (5) "prior salary history, performance, and other factors." *EEOC v. TXI Operations, L.P.*, 394 F. Supp. 2d 868, 879 & n.11 (N.D. Tex. 2005) (quoting *Pouncy v. Prudential Ins. Co.*, 668 F.2d 795, 802-03 (5th Cir. 1982) and *Lyons v. Burlington Coat Factory Warehouse*, No. 3:02-cv-0426-K, 2004 WL 515585, at *6,

---

[17] In Griggs, the Supreme Court wrote regarding Title VII of the Civil Rights Act of 1964 that
> Nothing in the Act precludes the use of testing or measuring procedures . . . . What Congress has forbidden is giving these devices and mechanisms controlling force unless they are demonstrably a reasonable measure of job performance. Congress has not commanded that the less qualified be preferred over the better qualified simply because of minority origins. Far from disparaging job qualifications as such, Congress has made such qualifications the controlling factor, so that race, religion, nationality, and sex become irrelevant.

401 U.S. at 436.

Relying on this language, the Court in *City of Los Angeles, Dept. of Water and Power v. Manhart*, 435 U.S. 702, 709 (1978 (footnotes omitted)), writing of the Equal Pay Act, that acknowledged the facially neutral actuarial studies  could identify differences in the life expectancies based sex, race , or national origin which had been used to justify  requiring all female employees to make larger contributions to pension funds than male employees, "[b]ut a statute that was designed to make race irrelevant in the employment market,  could not reasonably be construed to permit a take-home-pay differential based on a racial classification."  *Id.* at 709; *see also id.* at 711–14 & n.24 (explaining that differential was not based on a cognizable factor other than sex because only sex was used in classification of employees).

2004 U.S. Dist. LEXIS 3575, at *16-*17 (N.D. Tex. Jan. 3, 2004)) (other citations omitted).  Summary judgment is not appropriate, however, if a genuine fact issue on pretext exists.  *See id.* (finding that plaintiff produced no evidence of pretext); *Siler-Khodr*, 261 F.3d at 548–49 (holding fact issues precluded summary judgment where evidence contradicted reasons given by university for setting newly-hired professor's salary higher than that of opposite-sex plaintiff).

    *1.    Attracting Faculty to Support Accreditation Application*

    In his deposition, Shane testifies that UTB was pursuing AACSB accreditation when he joined the School of Business in 2006 and restarted the process by submitting a new application in the Spring of 2007.  *See* Shane Dep. 14:12–16:5.  AACSB accreditation rules required at least 50% of a school of business's faculty to have a terminal degree and meet the AACSB's definition of academically qualified ("AQ").  Essayyad Aff. ¶ 9.  Other faculty may be professionally qualified ("PQ").  *Id.*¶ 7 (discussing standards for PQ faculty); Dkt. No. 32 Ex. B-2 at 20, 24, 42 (setting forth accreditation standards).

    Essayyad avers that the departure of three faculty members he considered to be AQ in 2006, 2007, and 2008, *see* Dkt. No. 32 Ex. C-20 to C-22, left UTB's School of Business with five faculty members in 2008-09 academic year.  *See* Dkt. No. 32 Ex. H ¶¶ 6, 13.  Based on a review of their history of publications and other AACSB-qualified intellectual contributions, Essayyad states that he did not consider Sauceda and one other professor with a terminal degree[18] academically qualified at that time, *id.* ¶ 6, leaving the School of Business with one AQ faculty member and two PQ faculty members.

    Essayyad avers that UTB developed an action plan to strengthen its chances of obtaining AACSB accreditation.  Essayyad Aff. ¶ 10.  That plan included hiring AQ faculty members and supporting Sacueda's efforts to produce scholarly publications.  *See id.* According to his declaration, Essayyad reviewed "salary

---

[18] Sauceda does not compare herself to this male faculty member.  At the time UTB considered both not to be academically qualified, UTB paid him approximately $7,000 more per year than Sauceda.  *See* Dkt. No. 32 app. A.

information of peer institutions"[19] and AACSB salary surveys before determining that UTB could pay a salary of $105,000 "for the most qualified candidate." *Id.* ¶ 11. Essayyad further states that "[t]his salary was not based on gender, and we were not looking to hire a male faculty member but the most qualified applicant." *Id.* ¶ 11. One former UTB faculty member considered AQ compliant applied for the position but ultimately declined after unsuccessfully negotiating for a higher salary. *Id.* ¶ 12. Robertson also initially sought a higher salary but ultimately negotiated for three years' of tenure credit. *See id.* ¶ 16.

A reasonable fact finder viewing this evidence in the light most favorable to Sauceda could view UTB's actions are inconsistent with its assertion that the pay differential is based on the need to fortify the School of Business's AACSB application. *See Siler-Khodr*, 261 F.3d at 548; *TXI Operations, L.P.*, 394 F. Supp. 2d at 879. First, Essayyad states that UTB offered D. Boyd $8,000-per-year less after D. Boyd indicated that he did not want a tenure-track position. *See* Dkt. No. 32 Ex. H ¶ 16. UTB does not explain why D. Boyd's appointment as a visiting rather than tenure-track professor would have diminished his contribution to the School of Business's accreditation application and thereby account for a lower salary consistent with UTB's stated reasons for setting his salary. *See Siler-Khodr*, 261 F.3d at 548 (finding evidence legally sufficient to create fact issue where record contained evidence, when viewed in the light most favorable to the plaintiff, showing university awarded salary increases in a manner inconsistent with the stated reason for pay differential). Additionally, UTB set S. Boyd's salary at approximately $90,000-per-year when it hired her in January of 2011, yet Essayyad considered her AQ and therefore an asset worthy of inclusion in the School of Business's accreditation portfolio. *See* Essayyad Decl. ¶ 17; *Siler-Khodr* 261 F.3d at 548. Essayyad explains S. Boyd's salary by noting that she has an Ed.D without further elaboration. *See* Essayyad Decl. ¶ 16. To the extent Essayyad implies that other market forces might be at work, this explanation pours over into UTB's second affirmative defense.

---

[19] The record does not include a copy of this salary information.

2.    *Salary Compression, Inversion, and Market Forces*

UTB also asserts that the salary differential was based on market forces of supply and demand for newly-hired accounting faculty, i.e., salary compression or inversion.  *See* Essayyad Aff. ¶ 11; Dkt. No. 32 Ex. C-7 at 1 (asserting that AQ faculty salaries set based on market rate at time of hire).  Essayad states that he and the committee that eventually hired Robertson and D. Boyd consulted the salaries at peer institutions.  Dkt. No. 32 Ex. H ¶ 11; *see also* Shane Dep. 29:19–30:13 (stating that market rate believed to be between $110,000 and $120,000).  UTB also points to AACSB annual salary surveys for the 2008–09 academic year through the 2011–12 academic year which it contends tend to show that salaries for newly-hired faculty consistently exceed existing-faculty salaries and that salaries for new hires have increased at a greater rate than those of existing faculty in the same period.[20]  *See generally* Dkt. No. 32 Ex. B-4 at UTB-1838; *id.* Ex. B-6 at UTB-6229; *id.* Ex. B-7 at UTB-6439; *Id.* Ex. B-9 at UTB-6453.  These documents compare salaries of new hires with the mean salary of full-time accounting associate professors.  *See ibid.*  Finally, UTB points to its own history of hiring AQ accounting faculty since 2001, contending that newly-hired faculty have consistently received greater salaries than existing faculty regardless of sex.  *See generally* Dkt. No. 32 app. A.

Turning to the question of causation, without citing further summary-judgment evidence,[21] UTB asserts that the greater market salary of new hires is caused by an imbalance between the demand for newly-minted business Ph.D.'s and

---

[20] The Court expresses no view on the sufficiency of this statistical evidence.  The AACSB states that it surveys its member schools each year to gather salary data; though participation is not mandatory, over 75% respond.  Dkt. No. 32 app. B at UTB-1831.  UTB had not obtained AACSB accreditation when it hired Robertson and D. Boyd, and UTB does not address how, if at all, the market for AACSB academically-qualified faculty desiring to work in schools of business that have not yet been accredited differs from this sample.  Nor does UTB discuss the effect, if any, of self-selection on the reliability of these data.

[21] Sauceda cites a finding on similar facts at summary judgment in *Schultz.  See* 2007 WL 2066183, at *21–*22 (characterizing evidence produced at summary judgment by university).  The factual findings in *Shultz,* even if they could be considered competent summary-judgment evidence here, of necessity concern the market for accounting faculty on or before the date of that decision, July 1, 2007.

the number of such graduates each year on the academic market.  *See* M. for Summ. J. 29, Dkt. No. 32 (quoting *Schultz v. Bd. of Trustees of Univ. Of W. Fla,* No. 3:06-cv-442/RS/MD, 2007 WL 2066183, *21 (N.D. Fla. Jul. 13, 2007).  Assuming UTB's evidence establishes that the market for newly-hired faculty like Robertson and D. Boyd, then, the record includes no evidence showing whether the forces which shape the market which UTB alleges cause the pay differential between a woman and men performing equal work arise from "those subjective assumptions and traditional stereotyped misconceptions regarding the value of women's work." *First Victoria Nat'l Bank*, 420 F.2d at 656.  UTB acknowledges as much when it asserts that it may "consider market demand for an associate professor without violating the EPA, as long as there is no evidence that UTB took advantage of gender-based market forces."  Dkt. No. 32 at 30.  It asks the Court to adopt the reasoning of courts outside the Fifth Circuit to conclude that "[a]n employer may take market forces into account when determining the salary of an employee, provided there is no evidence suggesting that the employer took advantage of any kind of market forces that would permit different pay for a male and female for the same position." *Schultz v. Dep't of Workforce Dev.*, 752 F. Supp. 2d 1015, 1028 (W.D. Wic. 2010) (citations).  However, adoption of this proposition would shift the burden of production on this affirmative defense from the defendant to the plaintiff.  *See King v. Univ. Healthcare Sys., L.C.*, 645 F.3d 713, 725–26 (5th Cir. 2011) ("Because [plaintiff] has presented evidence adequate to establish a pay differential with an appropriate comparator, Dr. Mascia, the jury was within its discretion to conclude that [the defendant] bore the burden of establishing an affirmative defense"); *Jones*, 714 F.2d at 722 (quoting *Corning Glass Works*, at 497) (four enumerated exceptions to the Equal Pay Act, including factor-other-than-sex "are affirmative defenses on which the employer has the burden both of production and of persuasion").

Indeed, the Fifth Circuit's opinion in *Siler-Khodr*, 261 F.3d at 549, placed the burden of production and persuasion on the defendant who relied an affirmative defense based purely on market forces.  There, the defendant asserted that two factors other than sex formed the basis of its decision to pay a newly-hired male

professor at an annual salary of $20,000 more than the female plaintiff who taught in the same department. *See id.* at 544. The university relied, among other things, on the testimony of a dean. *See id* at 549. He testified "that the salary paid to a new employee is driven almost entirely by market forces [and] the University must expend resources to attract qualified individuals in a market where other organizations have the same goal." *Id.* The *Siler-Khodr* court rejected this evidence as insufficient to show that the pay differential was based on a factor other than sex, explaining that "[t]his Court has previously stated that the University's market forces argument is not tenable and simply perpetuates the discrimination that Congress wanted to alleviate when it enacted the [Equal Pay Act]." *Id.* (citing *Brennan v. City Stores, Inc.*, 479 F.2d 235, 241 n.12 (5th Cir. 1973)).

The panel in *Siler-Khodr*, found the university's evidence regarding the market for professors to be similar to that of the defendant in *City Stores*. There, a department store argued that "the tighter market for salesmen and male tailors justifies [the defendant's] hiring of men with such skills at a rate higher than that paid to obtain women of similar skills." *City Stores*, 479 F.2d at 241 n.12. Factors other than sex such as customer embarrassment justified "seeking male personnel to work in conjunction with selling and fitting [male] clothing," but "this is no excuse for hiring saleswomen and seamstresses at lesser rates simply because the market will bear it. Just such disparities were what Congress intended to correct by this legislation." *Id.*

The opinion in *Siler-Khodr* does not indicate that the plaintiff produced any evidence tending to show that the market for professors from which her comparator was hired was infected with discriminatory stereotypes or assumptions as one would expect if the plaintiff bore the burden of production on that issue. *See* 261 F.3d at 549. Rather, the Fifth Circuit rejected the university's evidence as insufficient, implying that that the defendant had the burden of production, and, absent a showing by the defendant sufficient to obtain summary judgment, the unseen hand of the market does not enjoy a presumption that it is free from the discriminatory assumptions and stereotypes in the labor market Congress passed

the Equal Pay Act to eradicate. [22]  *See id.*  Since UTB concedes that "there is no evidence," Dkt. No. 32 at 30, on whether the market forces on which it allegedly relied arise from outmoded assumptions or stereotypes, it is not entitled to summary judgment on this alleged factor other than sex.  *Siler-Khodr*, 261 F.3d at 549.

### 3.   *Good Faith*

UTB does not expressly allege that it acted in good faith, but the Court briefly turns to Essayyad's statement that the salary-setting decisions here were "not based on gender, and we were not looking to hire a male faculty member but the most qualified applicant."  Dkt. No. 32 Ex. H ¶ 11.  The Court does not in this opinion make any finding or express any view concerning the intent of Essayyad or any of the UTB officials involved.  That issue is not now before the Court.  *See King v. Univ. Healthcare Sys.*, *L.C.*, 645 F.3d 713, 725 (5th Cir. 2011) (citing 29 U.S.C. § 216(b) and *Lowe v. Southmark Corp.*, 998 F.2d 335, 337 (5th Cir. 1993)) ("Unless an employer can demonstrate that it violated the EPA in good faith and with reasonable grounds for believing it was not violating the Act, an award of liquidated damages is mandatory.").

### 4.   *Conclusion*

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendant's Motion for Summary Judgment, Dkt. No. 32, and **DENIES AS**

---

[22] The Congress hereby finds that the existence in industries engaged in commerce or in the production of goods for commerce of wage differentials based on sex (1) depresses wages and living standards for employees necessary for their health and efficiency;(2) prevents the maximum utilization of the available labor resources;(3) tends to cause labor disputes, thereby burdening, affecting, and obstructing commerce;(4) burdens commerce and the free flow of goods in commerce; and(5) constitutes an unfair method of competition.(b) It is hereby declared to be the policy of this Act, through exercise by Congress of its power to regulate commerce among the several States and with foreign nations, to correct the conditions above referred to in such industries.

Equal Pay Act of 1963, Pub. L. No. 88-38 § 2, 77 Stat. 56, quoted in *First Victoria Nat'l Bank*, 420 F.2d at 658 n.19.

**MOOT** its motion to dismiss pursuant to Federal Rule of Civil Procedure 12(B)(1), Dkt. No. 62.   The Court **DISMISSES** Plaintiff's TCHRA claim **WITHOUT PREJUDICE** for lack of subject-matter jurisdiction and **DENIES** summary judgment on Plaintiff's Equal Pay Act claim.

It is so **ORDERED**.

SIGNED this 26th day of July, 2013.

Hilda Tagle
Senior United States District Judge